## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

IN RE:

| | | |
|---|---|---|
| FLORIDA TRUCKING CO., INC. | : | Case No. 09-11791-8D1 |
| KEARNEY CONSTRUCTION CO., LLC | : | Case No. 09-18848-8D1 |
| KEARNEY CONSTRUCTION CO., INC | : | Case No. 09-18851-8D1 |
| AVT EQUIPMENT, LLC | : | Case No. 09-18861-8D1 |
| Debtor(s) | : | |
| | : | |

- - - - - - - - - - - - - - - x

Sam M. Gibbons
U.S. Courthouse
801 N. Florida Avenue
Tampa, Florida 33602
Held September 1, 2009

## TRANSCRIPT OF HEARING

[Re: 09-11791] 1-Emergency Motion For Joint
Administration Of Lead Case 8:09-BK-11791-CED with 8:09-
BK-11792-CED, 8:09-BK-18848-CED, 8:09-BK-18851-CED, and
8:09-BK-18861-CED (Doc. #87); [Re: 09-18848] 1-Emergency
Motion For Joint Administration Of Lead Case 8:09-BK-
11791-CED with 8:09-BK-11792-CED, 8:09-BK-18848-CED,
8:09-BK-18851-CED, and 8:09-BK-18861-CED Filed By Stephen
R. Leslie On Behalf Of Debtor Kearney Construction Co.,
LLC (Doc. #4); 2-Motion To Use Cash Collateral & Granting
Replacement Lien (Doc. #11) and Opposition To Use Of Cash
Collateral By Travelers Casualty & Surety Company Of
America (Doc. #27)
***[NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]***


### BEFORE THE HONORABLE CARYL E. DELANO
### United States Bankruptcy Judge


*PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING*
*TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE*
*APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS*

### JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

*[NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

3-Emergency Motion For Authorization To Pay Prepetition
Wages, Salaries And Other Employee Benefits (Doc. #13);
4-Emergency Motion Prohibit Utilities From Altering,
Refusing, Or Discontinuing Service On Account Of
Prepetition Invoices; Approving Debtor's Proposed
Adequate Assurance Of Payment; And Establishing
Procedures For Determining Additional Requests For
Adequate Assurance Of Payment (Doc. #15); 5-Emergency
Motion For Authority To Pay Prepetition And Postpetition
Officer And Insider Salaries (Doc. #17); 6-Emergency
Motion For Order Authorizing The Maintenance Of Existing
Bank Account At Platinum Bank (Doc. #36); 7-Emergency
Motion Of Hardin Construction Company LLC To Set Prompt
Deadline For Assumption Or Rejection Of Executory
Contract (Doc. #25); [Re: 09-18851] Emergency Motion For
Joint Administration Of Lead Case 8:09-BK-11791-CED with
8:09-BK-11792-CED, 8:09-BK-18848-CED, 8:09-BK-18851-CED,
and 8:09-BK-18861-CED Filed By Stephen R. Leslie On
Behalf Of Debtor Kearney Construction Co., LLC (Doc. #4);
[Re: 09-18861] 1-Emergency Motion For Joint
Administration Of Lead Case 8:09-BK-11791-CED with 8:09-
BK-11792-CED, 8:09-BK-18848-CED, 8:09-BK-18851-CED, and
8:09-BK-18861-CED, Filed by Stephen R. Leslie on Behalf
of Debtor Kearney Construction Co., LLC (Doc. #4)

# A P P E A R A N C E S

For the Debtors    HARLEY E. RIEDEL, Esquire
            BARBARA A. HART, Esquire
            Stichter Riedel
            Blain & Prosser
            110 E. Madison Street
            Suite 200
            Tampa, Florida 33602
            813-229-0144
            hriedel@srbp.com
            bhart@srbp.com

For Travelers     ALBERTA L. ADAMS, Esq.
            JAMES A. BLACK, Esquire
            Mills Paskert Divers PA
            100 N. Tampa Street
            Suite 2010
            Tampa, Florida 33602-5145
            813-229-3500
            aadams@mpdlegal.com
            jblack@mpdlegal.com

For Bank of America   JEFFREY WARREN, Esquire
            Bush Ross, P.A.
            1801 North Highland Avenue
            Tampa, Florida 33602-2656
            813-224-9255
            jwarren@bushross.com

For the United States  CYNTHIA BURNETTE, Esquire
Trustee         U.S. Trustee's Office
            501 E. Polk Street
            Suite 1200
            Tampa, Florida 33602-3945
            813-228-2000
            Cindy.P.Burnette@usdoj.gov

**A P P E A R A N C E S**
**(Continued)**

For G.E. Commercial        RABIAN M. BROOKS, III, Esq.
Finance Business           Thompson & Brooks
Property Corporation       412 E. Madison Street
                           Suite 900
                           Tampa, Florida 33602-4617
                           813-387-1821
                           rbrooks@thompsonbrookslaw.com


For Wells Fargo            TYLER CATHEY, Esquire
                           Holland & Knight
                           100 N. Tampa Street
                           Suite 4100
                           Tampa, Florida 33602
                           813-227-8500
                           tyler.cathey@hklaw.com


For Hardin                 DONALD R. KIRK, Esquire
Construction               Fowler White
                           P.O. Box 1438
                           Tampa, Florida 33601-1438
                           813-222-2022
                           dkirk@fowlerwhite.com


Also Present               Brian Seeger, President
for Kearney                Joe Pitre, CFO
                           Bing Kearney, Principal
                           Chase Kearney, Principal


Also Present               Michael McCandless
for Hardin                 Aaron Goodman

**P R O C E E D I N G S**

(Whereupon, the proceedings commenced at 2:02 p.m.)

THE COURTROOM DEPUTY:  All rise.  The United States Bankruptcy Court for the Middle District of Florida is now in session.  The Honorable Caryl E. Delano presiding.  God save the United States and this Honorable Court.

THE COURT:  Good afternoon.  Please be seated.

THE COURTROOM DEPUTY:  Did you want me to call them all together, Judge?

THE COURT:  Yes, please.

THE COURTROOM DEPUTY:  Case No. 09-11791, Florida Trucking Company, Inc.; Case No. 09-18848, Kearney Construction Company, LLC; Case No. 09-18851, Kearney Construction Company, Inc.; and Case No. 09-18861, AVT Equipment, LLC.

THE COURT:  Appearances, please.

MR. RIEDEL:  Thank you, Your Honor. Harley Riedel and Barbara Hart on behalf of the Debtors.  And Brian Seeger, president of the Debtors, is present, as is Joe Pitre, CFO, and two of the principals, Bing Kearney and Chase Kearney are present in the courtroom.

THE COURTROOM:  Thank you.

MR. WARREN:  Good afternoon, Your Honor.
Jeffrey Warren on behalf of Bank of America.

THE COURT:  Thank you.

MS. ADAMS:  Good afternoon, Your Honor.
Alberta Adams and Jim Black on behalf of Travelers.

THE COURT:  That's Mr. Black?

MR. BLACK:  Yes, Your Honor.

THE COURT:  Thank you.  For Travelers,
thank you.

MS. ADAMS:  Thank you.

THE COURT:  All right.

MR. BROOKS:  Good afternoon, Judge.
Radian Brooks on behalf of G.E. Commercial Finance
Business Property Corporation.

THE COURT:  Thank you.

MR. CATHEY:  Good afternoon, Your Honor.
Tyler Cathey on behalf of Wells Fargo.

THE COURT:  Thank you.  And how do you
spell your last name?

MR. CATHEY:  C-a-t-h-e-y.

THE COURT:  Cathey, thank you.

MR. KIRK:  Your Honor, Donald Kirk on
behalf of Hardin Construction.  With me in chambers
is Michael McCandless and Aaron Goodman, both of

1      Hardin.

2               THE COURT:  Thank you.

3               MS. BURNETTE:  Cindy Burnette for the U.S.

4      Trustee.

5               THE COURT:  Good afternoon.  Thank you.

6      All right, Mr. Riedel?

7               MR. RIEDEL:  Thank you, Your Honor.  We

8      have a number of matters on the calendar from a

9      first-day standpoint.  And I thought I might give

10      you a little bit of background that would be

11      relevant to all of the motions.

12               I would indicate that the factual matters

13      that I'll speak to would be -- I'd proffer as the

14      testimony of Mr. Seeger or Mr. Pitre, depending

15      whether it's business or financial, both of whom are

16      in the courtroom.

17               Your Honor's familiar with the Florida

18      Trucking and Florida Equipment cases that have been

19      pending for some time.  These are three related

20      companies.

21               The Florida Trucking and Florida Equipment

22      cases primarily deal with equipment that was used

23      to support the construction activities of these

24      Debtors, although they were available to third

25      parties, largely were customers.  The Debtor,

1   Kearney Construction was a customer of Florida

2   Trucking and Florida Equipment.

3      Kearney Construction Company, LLC, is

4   the currently active contracting entity.  It has

5   currently on its books 32 contract -- open

6   contracts, of which 12 -- and I have a chart of

7   these I'll hand up later in connection with cash

8   collateral and some of the other motions.  But 12

9   of those are active and ongoing.

10      And this client does paving, site clearing

11   and that kind of work generally.  It serves as both

12   a subcontractor and a general contractor, depending

13   on the circumstances.

14      And on the ongoing jobs, what you would

15   see, if you went to those ongoing jobs depending,

16   is a combination of things.  You'd see some

17   subcontractors that we would hire that would be

18   performing work for us.  But you'd also see a lot of

19   our equipment that we own -- one of these Debtors

20   owns -- that might be providing services there,

21   hauling material, otherwise providing paving

22   services.  And you'd see direct employee costs as

23   well.

24      So all of these work -- involve a

25   combination of our personnel and our equipment and

1       some subcontractors and materialmen as well.

2              We have 16 jobs out of the 32 -- so we

3       have 12 ongoing and active.  We have 16 that we view

4       as substantially complete.  One we believe was

5       wrongfully terminated.  It's the Highway 41 project

6       in Pasco County.  But we're off the job.  We're not,

7       other than -- we're recently off the job, so

8       obviously we are making sure that we are fully

9       maintaining records.  And we think that we were --

10      because we were wrongfully terminated, that will

11      turn into a lawsuit that we'll recover on.

12             But in any event, the rest of them we

13      think are just positive.  We have some retainage in

14      a lot of cases due where the job's essentially

15      performed, maybe we have punchlists, but those 16

16      are there.

17             Then we have four special cases.  One, the

18      owner filed bankruptcy itself and so we're stayed.

19      That's about 60 percent done and we have lien

20      claims.  And one is fully completed and accepted but

21      has remaining claims so that'll just be unsecured

22      debt that is finished.  And we have two in

23      litigation that are also finished and accepted and

24      accepted by the owner but there's litigation.  Those

25      two are bonded.

1      We have 11 bonded contracts out of those

2   32 and the rest are non-bonded contracts.  Travelers

3   is our bonding company so --

4      THE COURT:  How many of the 12 open

5   contracts are bonded?

6      MR. RIEDEL:  Three of the open contracts

7   are bonded, what we regard as open contracts.  One

8   of the issues we will address, I think, today or at

9   the continued hearing, but hopefully today, is

10  Travelers did send letters on, we think all of these

11  jobs, the open as well as the ones we view as

12  complete, asking the owner or general contractor, as

13  the case may be, to pay Travelers instead of us.

14     We've actually collected some money on

15  those jobs and we know Travelers has collected some

16  money.  So that will need to be sorted out as part

17  of the cash collateral and operations.

18     The companies currently employ about 155

19  people.  And that's down from the high level.  This

20  company did, I think -- our case management summary

21  which was filed indicates $100 million worth of

22  business as recently as 2007, and is a victim of the

23  declining construction real estate market and the

24  general economic malaise that has pervaded our

25  economy.

1        So it's regarded, I think, universally as

2    one of the premier contractors in the Hillsborough

3    County, Tampa Bay area.  It has a long history, 53

4    years or so of history of operations, has many

5    repeat customers, who over the years have employed

6    them again and again because the quality of work was

7    high and performance was good.

8        So we're here today, I think, just as a

9    result of the economy more than anything else, and

10   downsizing what was a major business into trying to

11   compete for the fewer -- many fewer jobs that are

12   available.

13       So there is some synergy, there's common

14   management, between these entities.  They generally

15   have guaranteed all the same debts so there's common

16   creditors.  So the motions we have filed today, with

17   that background, include for joint administration --

18           THE COURT:  May I interrupt you one

19   moment?

20           MR. RIEDEL:  Yes, Your Honor.

21           THE COURT:  I believe you stated that

22   Kearney Construction Company, LLC, was the active

23   entity.  What is the status of the other two new

24   recently filed 11s?  And that's Kearney Construction

25   Company, Inc. and AVT Equipment, LLC?

1          MR. RIEDEL:  As a practical matter, Your

2     Honor, Kearney Construction Company, Inc. would have

3     been the primary contractor.  There are some tax

4     issues, I understand, that essentially moved the

5     business over to LLC to be able to bring in

6     additional investors and equity participants in

7     the LLC forum.

8          I think there may be one contract

9     remaining that's not among the 32, where there's

10    some money left on a Kearney Construction Company,

11    Inc. case.  But essentially, the employees are still

12    employees of Inc.  So essentially it almost acts as

13    an employee leasing company where all of the

14    employees are paid out of Kearney Construction

15    Company, Inc.

16         THE COURT:  All right.  So the employees

17    are paid out of Kearney Construction Company, Inc.

18    but the contracts that you've just described, the

19    ongoing contracts, are all under the name of Kearney

20    Construction Company, LLC, correct?

21         MR. RIEDEL:  That's my understanding, Your

22    Honor, yes.

23         THE COURT:  Okay.  All right, and then

24    what about AVT?

25         MR. RIEDEL:  AVT has some equipment that

1 is used in the operations, you know, various paving

2 and other earth-clearing type of equipment.

3    THE COURT:  All right.  And it has no

4 direct employees itself?

5    MR. RIEDEL:  That's correct, Your Honor.

6    THE COURT:  Okay.  And then the employees

7 of Florida Trucking Company are actually -- are they

8 actually employees of Kearney Contraction Company,

9 Inc., or are they separate?

10    MS. HART:  Your Honor, to some extent,

11 there are -- my recollection is there are 15 actual

12 truck drivers that are with FTC.  The remaining

13 employees are shared between the affiliate Debtors.

14    THE COURT:  All right, thank you.  Okay,

15 thank you.

16    MR. RIEDEL:  Your Honor, then just to

17 survey what is on the calendar, we have joint

18 administration motions.  We have a motion to use

19 cash collateral.

20    And just an overview, in looking at the

21 UCCs, it appears that Bank of America -- we listed

22 all the creditors that might have claims.  We think

23 Bank of America is the creditor that has the senior

24 and perhaps the only valid lien on anything that

25 would be cash collateral, accounts receivable, and

don't see that in other parties.

We do recognize that Travelers, under the Pearlman Supreme Court case and various cases, has subrogation rights within a particular job contract, so that our interest in the accounts arising from that contract is in the profit, after the payment of subcontractors and materialmen and after completion of the job.

So it's really a -- it's almost as though their lien or subrogation rights, if they have to pay subcontractors, would be paid before any lien on that. But that does not attach to other contracts, so it's contract project by project.

We have an emergency motion to pay prepetition wages, salaries and other employee benefits. I think that's about a $95,000 total dollar amount for the 155 employees and all below the priority amount. We have the standard utility motion where we offer two weeks, and give the parties a chance to object if they want a higher deposit.

We have officers' salaries, and I think then there are two emergency motions filed by creditors, Hardin Construction and Travelers, and an opposition by Bank of America on cash collateral.

So I think that's the universe of matters before
Your Honor today.

THE COURT:  Right.  I think Travelers also
filed an opposition to the motion to use cash
collateral.

MS. ADAMS:  Yes, ma'am.

THE COURT:  Okay.  All right, well so
shall we take up the joint administration motion
first then?

MR. RIEDEL:  I think that makes sense,
Your Honor.

THE COURT:  All right.  Do you have
anything to add to the presentation?

MR. RIEDEL:  No, Your Honor.

THE COURT:  All right.  Does any party
object to these cases being jointly administered?

MR. WARREN:  No, Your Honor.  The bank
does not.

THE COURT:  All right.  In that case,
there being no opposition, and it appearing that the
cases have common ownership and management, it seems
to make sense to have them jointly administered.  So
that motion will be granted.

I think that the motion proposed a caption
that would be the caption for all the cases, so that

1    everything will be filed in the main case, which

2    will be Florida Trucking Company, Inc.  Separate

3    claims files would be maintained, however.

4              MR. RIEDEL:  Thank you, Your Honor.

5              THE COURT:  So, Mr. Riedel, if you'd

6    submit that order.

7              MR. RIEDEL:  And we'll submit orders in

8    each of the cases --

9              THE COURT:  Right.

10             MR. RIEDEL:  -- that will reflect that.

11             THE COURT:  Right.  And I believe the

12   motion was filed in each case, correct?

13             MR. RIEDEL:  Correct, Your Honor.

14             THE COURT:  All right.  All right, then

15   does it make sense to move on to the cash collateral

16   motion next?

17             MR. RIEDEL:  I think that is fine, Your

18   Honor.  And I would like to just hand up, if I

19   could, a sheet.  I've given this to counsel -- if I

20   can find my copies -- as well so --

21             THE COURT:  Is that the sheet that was

22   attached to the --

23             MR. RIEDEL:  This is a color-coded sheet.

24             THE COURT:  Ah, all right.

25             MR. RIEDEL:  (Presenting document.)

1          THE COURT:  Thank you.

2          MR. RIEDEL:  This will tie into, somewhat,

3     the sheet that's attached to the budget.  But at

4     the top, Your Honor, you'll see this is broken down

5     into three groups.  And the top group is the 12

6     contracts, starting with Le Jardin Apartments, that

7     are ongoing active jobs.  And the ones that are

8     highlighted are bonded jobs.  So that's the three

9     ongoing contracts.

10          And just so Your Honor understands, the

11    remaining billing is the amount left in the

12    contract, at the top line.  The remaining costs to

13    complete of $42,000 is what it costs to complete.

14    And then the next number is just you deduct

15    remaining costs, and so that would be net cash to

16    the Debtor, the $32,000 on the Le Jardin Apartments.

17          THE COURT:  Okay.  So the column titled

18    there, Estimated Cash to Complete, really is net

19    cash or net profit.

20          MR. RIEDEL:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. RIEDEL:  Then we have outstanding

23    bills on these, so we have an account receivable of

24    $605.  We have retainage -- and retainage in the

25    construction business, of course, is a lot of times

1    where you get your profit.  I mean, this is what's

2    left over at the end of the job.

3          The way we handle cases, or work, is we

4    may be called in at the very beginning of the job to

5    do site work, and generally retainage may not be

6    paid until the job is accepted and so all the trades

7    have finished their work in the job.

8          But the good news is the paving part of

9    our work is usually the last thing, after they get

10    everything else in, you know, close to the end when

11    they've got the building in, then they put the

12    paving in and the landscaping and the so forth.

13          THE COURT:  So you're doing the site work

14    on the front end and the paving work on the back

15    end.

16          MR. RIEDEL:  Correct, Your Honor.

17          THE COURT:  Okay.

18          MR. RIEDEL:  So if the retainage is done,

19    you know, that's where, again, we have significant

20    amounts of profit, I we hope, or cash flow.

21          And then we have payables.  And we clearly

22    recognize that for us under our contracts, to the

23    get the money, we have to furnish lien releases.  So

24    these need to be paid in order for us to collect the

25    amount.  There's minor ones on Le Jardin.

1          And you then that's -- then we owe the

2     retainage, which would be the next column, to our

3     subcontractors.  And if you total everything after

4     the estimated cash, so the retainage due to us and

5     the account receivable less the payables, that's the

6     $81,115.  And so there'd be $113,000 of profit --

7     cash flow, regardless of whether it was profitable

8     from day one, but remaining cash today in that

9     project of $113,000.

10          THE COURT:  All right.  So that net is

11    actually the net profit in the third column plus the

12    retainage, less the outstanding payables, less the

13    retainage you owe to others, correct?

14          MR. RIEDEL:  Exactly.

15          THE COURT:  Okay.

16          MR. RIEDEL:  So we have gone through and

17    analyzed this, and obviously if you have the last

18    column as a negative, we would be thinking about

19    rejection if it were significantly negative, as

20    opposed to continued performance.  But in all of

21    these, we believe that we should end up with the

22    day -- at the end of the day, collecting this

23    $1.9 million positive number.

24          The same thing is true with respect to the

25    next column.  Although there's a slightly misleading

1    part on the Channel 2 Culbert.

2          THE COURT:  Okay, when you say column, you

3    mean the next block of --

4          MR. RIEDEL:  Next block.

5          THE COURT:  Okay.

6          MR. RIEDEL:  Which there's 16 in

7    this block.  And these are the ones that are

8    substantially complete, or we don't see much we're

9    doing going forward, I think.  There's a couple that

10   deserve attention.  The Culbert -- the Channel 2

11   Culbert.  We actually have collected $500,000, which

12   we would regard as being impressed with a trust to

13   pay Culbert expenses, so that actually turns that

14   into a non-negative number.  And we've actually

15   collected that.

16          The next one is the U.S. 41 we've been

17   terminated on, and we will have claims for monies

18   owed to us, but that's up in Pasco County and we're

19   no longer performing services.

20          THE COURT:  All right.  Let me interrupt

21   you for just a moment.  The second column, the

22   remaining cost to complete, that factors in

23   estimates of manpower and whatever equipment needs

24   to be used or -- I mean, tell me how that number was

25   calculated.

1          MR. RIEDEL:  Yes.  I think that is the

2     total cost that we would spend going forward to be

3     able to complete the money at the end.

4          THE COURT:  Okay.

5          MR. RIEDEL:  And I don't -- I might ask

6     Mr. Pitre.  You know, I suppose there's some

7     judgment as to whether you could move a couple of

8     these up into the higher block.  I think just

9     because of the magnitude of these contracts, we may

10     regard that as substantially done.

11          The contract amount on the Culbert was

12     $2.2 million originally.  So you can see the

13     remaining billing at 244.  You know, that's at 90

14     percent.  So I think, you know, that could be in the

15     top block or here, but we think the numbers are

16     right.

17          The Cypress Creek Mall is in litigation

18     where we're seeking and hoping to collect the

19     substantial $2.1 million that's there.  But if you

20     eliminate the litigation claim of Cypress Creek

21     Mall, add back in the $500,000 on Channel 2 Culbert,

22     we would end up with another $1.3 million or so

23     positive cash, we believe, on these jobs.

24          Then the ones -- the block at the bottom

25     with the four are ones that other than potential

1    litigation, we're not doing anything with respect to

2    those, not spending any money on those four.

3          THE COURT:  And does this chart include

4    the one contract that's in the name of Kearney

5    Construction Company, Inc.?

6          MR. RIEDEL:  It does not but I think that

7    that is -- Mr. Pitre may be -- if I could just ask

8    him, Your Honor.  (Conferring.)

9          No, that is substantially complete.  It's

10    not on this.  It probably has about $50,000 of

11    potential value.

12          THE COURT:  All right, thank you.

13          MR. RIEDEL:  Your Honor, what we would

14    like to do is spend cash collateral to finish these

15    jobs, maintain the infrastructure, be prepared.

16    There is one contract here that I should also say

17    that we have not yet commenced work on, and there's

18    no money built in currently on that.  But there is

19    one job that's out there that is sort of in the very

20    early startup phases that we want to look at and

21    think about starting up at this stage of the case.

22          But the cash collateral we'd like to spend

23    is to maintain the employees that are working on the

24    jobs, the office staff.  And we did attach a budget

25    to our cash collateral motion that I'd like to just

1    ask you to look at.

2              THE COURT:  That's Exhibit A to the

3    motion?

4              MR. RIEDEL:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MR. RIEDEL:  We've estimated over the next

7    30 and then 15 days that contract sales -- and these

8    are draws.  I mean, this is source of revenue.  So

9    these would be draws on construction contracts.

10             THE COURT:  Okay.  And so do these numbers

11   tie in to the numbers that are on this -- the big

12   chart?

13             MR. RIEDEL:  The big chart is more recent

14   and more accurate, although it doesn't have the

15   15-day and 30-day timing.  That's actually through

16   the life of the contract.  So they're not going to

17   tie exactly, but they're going to be consistent.

18             The $2 million and $4 million are

19   estimates.  And, for example, we've already

20   collected, in the few days here, some $775,000 of

21   amounts.  So of this $2 million, in 15 days we've

22   collected $700,000 -- or almost $800,000.

23             The items we would like to spend on is the

24   direct labor on projects which is this $221,000 for

25   the next two weeks, give or take.  Then the material

1    and subcontractor are estimates as to what we will

2    get from subs and materialmen on draw requests.  And

3    obviously, we've agreed with Mr. Kirk's client, for

4    example, to do joint checks so he gets the lien

5    release and so they can actually make a check to the

6    subcontractor and materialmen, and we'll get the

7    net.  I mean, we'll do the work, but we're paid

8    those.

9         That will vary.  We can estimate those but

10   essentially those are amounts we need to pay in

11   order to get the top number, the $2 million on the

12   draws.

13        THE COURT:  Let me interrupt you for a

14   moment.  You've got $2 million on the 15-day budget

15   and $4 million on the 30-day budget.  Is that -- is

16   the $2 million included in the $4 million?

17        MR. RIEDEL:  Yes, Your Honor.

18        THE COURT:  Okay.

19        MR. RIEDEL:  And you can see that in many

20   of these -- I mean, there is some variation but some

21   of these are just functions of doubling for the

22   period of time, and I assume we'd be back inside

23   sometime inside before the 30 days has fully run and

24   have an actual as well.

25        We then have a whole category, I won't go

1    through in detail, of direct equipment costs, but

2    this is the equipment that we have on the project

3    that we'd be maintaining.  In the overall aggregate,

4    it looks like about 8 percent of the total draws

5    we'd be spending on that.

6         We have direct contract overhead.  This is

7    the burden on these other items, the wages, for

8    example, the health coverage on the salaries and so

9    forth. Again, not a large amount.  About 4 percent

10   of the total.

11        And then we have all of the office

12   expense.  And as you look through these, I don't

13   think any of these are going to look unduly high.

14   The biggest items are administrative staff salary of

15   $30,000 and officers' salaries which we'll get to

16   later this morning of $37,000 for the two-week

17   period.  And in the aggregate, again, about six

18   percent of the total amount is there.

19        These will vary.  They're hard to

20   estimate with great accuracy in this business, but

21   essentially as we spend money -- and you'll see that

22   there is cash flow loss that's reflected in the

23   bottom line.  But if that's the case -- I mean,

24   there would be two reasons for that.  One is we're

25   building accounts receivable that, you know, we're

1    actually paying employees to work on a job that

2    we're going to bill the next month beyond this 30-

3    day cycle.

4          And the biggest thing is is our biggest

5    single job, I understand, was the Highway 41 Pasco

6    job that was terminated, so we're in a downsizing

7    mode.  We would have had people within the last

8    couple weeks, but those people are now making sure

9    that we preserve our contract claims with respect to

10   that job.  And so we will have some reduction in

11   expenses as time passes based on that -- the loss of

12   that job.

13         So, Your Honor, we would like, subject to

14   coming back in short order, to be able to spend

15   funds, to maintain the business operation

16   substantially in accordance with this budget.

17         THE COURT:  Okay.  And does the Debtor

18   have an estimate of what new accounts receivable are

19   going to be generated from the work that's being

20   done?

21         MR. RIEDEL:  I don't have one, although

22   Mr. Pitre might, in this particular time frame, but

23   would indicate that as we collect all of these

24   accounts -- one of the other things that has -- you

25   know, the Travelers notices to pay Travelers instead

1    of us, we think has slowed down the payment of

2    anybody.

3           Travelers says they haven't collected very

4    much.  We've collected a couple.  So but I don't

5    have the exact timing on how that would tie in

6    except to say we've got this $3.2 million of net

7    dollars at the end of the day, and the -- excuse me,

8    Your Honor.  (Conferring.)

9           Your Honor, Mr. Pitre says that the

10   $9.5 million that's in the fourth column, I guess --

11   well, let me just -- I'm not sure if that's right,

12   actually, as I look at my sheet.

13          I think the total amount of the 3.2 net

14   that's from the two top slots in the color-coded

15   sheet are the amounts that we would hope to collect.

16   And the out of pocket expenses, in other words other

17   than the subs and material money, which form by far

18   the largest percentage of these expenses, is the --

19   if you look at the 30 days, the $318,000 direct

20   equipment cost.

21          THE COURT:  Okay, I'm not sure what I'm

22   looking at.

23          MR. RIEDEL:  I'm sorry.  The budget again,

24   Your Honor.

25          THE COURT:  Okay.  All right, so where am

1    I looking on the budget?

2            MR. RIEDEL:  Direct equipment costs.

3            THE COURT:  Okay.

4            MR. RIEDEL:  $318,000.

5            THE COURT:  All right.

6            MR. RIEDEL:  Direct contract overhead,

7    $173,000.  Total SG&A $258,000.

8            THE COURT:  Okay.

9            MR. RIEDEL:  Then you can go back to the

10   direct labor and other, but exclude materialmen and

11   subcontractors.  Maybe I just should have said

12   exclude materialmen and subcontractors, and subtract

13   that from the bottom.  But in any event, that would

14   be the amounts I think we would expect to collect,

15   most of this $3 million over the next 90 days,

16   that's the net profit here.  And that would be the

17   amount of spending.

18           So we're going to more than cover, we

19   think, and have excess over any amounts we're

20   spending.  And we're not going to collect any of

21   these amounts if we don't stay in business and

22   complete these jobs and administer them and collect

23   them.

24           THE COURT:  Okay.  And then just tying it

25   in to the big chart, just talking in round numbers.

1    On the first 12 cases, you expect to end up with a

2    net cash of let's just call it $2 million.  It's

3    $1.9 million, but let's just call it $2 million.

4    Right?

5             MR. RIEDEL:  Right.

6             THE COURT:  Okay.  And then on these 16

7    that are substantially complete, the number there is

8    2.9 million, so let's call it 3.  You said you had

9    to back out the 500,000 that's been collected.  But

10   you believe that you'd add money on the -- if the

11   terminated job on U.S. 41 was added back in, I think

12   you said that that would generate another million

13   dollars positive, correct?

14            MR. RIEDEL:  Correct, Your Honor.

15            THE COURT:  Okay.  So instead of calling

16   that $2 million, you'd call it $4 million, right?

17            MR. RIEDEL:  Right.

18            THE COURT:  Okay.  I think what you said

19   was by the time you backed out the $500,000 that you

20   collected and added in what you think you're going

21   to get on the Route 41 job, that you'd be up a

22   million.  So that's $4 million.  So you're

23   talking --

24            MR. RIEDEL:  And that excludes the Cypress

25   Mall litigation, which adds $2 million to that.

```
1              THE COURT:  Right, okay.  So if it -- is
2     it $2 million plus $4 million gives you a total of
3     $6 million.
4              MR. RIEDEL:  I think it's $2 million plus
5     another $2 million on the litigation, plus a total
6     of another $1.3 million on the substantially
7     complete contracts excluding the litigation.  So
8     $5.4 million thereabouts, give or take.
9              THE COURT:  Okay.  $5.4 million, okay.
10    And this money is expected to come in over what time
11    period?
12             MR. RIEDEL:  The litigation I think is
13    uncertain.  But for the most part, the rest of it
14    would come in in the next 90 days or so.
15             THE COURT:  Okay.  So if there's
16    $1.3 million on the litigation, you're really
17    talking about -- I can't do the math.  3.1 --
18             MR. RIEDEL:  I'm sorry.  It's $2 million
19    on the litigation, Your Honor.
20             THE COURT:  All right, 2 -- I'm sorry,
21    $2 million on the litigation.  So then really you're
22    talking about 3.3 million coming in over the next 90
23    days.
24             MR. RIEDEL:  Yes, Your Honor.
25             THE COURT:  90?  Okay.
```

```
 1                 MR. RIEDEL:  Is that's roughly right?
 2     (Conferring.)
 3                 THE COURT:  Okay.  But then going --
 4     flipping to the budget, then --
 5                 MR. RIEDEL:  I guess actually, Your Honor,
 6     I would -- the Highway 41, which I also indicated is
 7     in litigation, you probably ought to take out that
 8     $600,000, so you'd be back to maybe 2.7 or so.
 9                 THE COURT:  Okay.  So there's 2.7 that
10     gets collected.  And according to this 30-day budget
11     it's going to be spent and then some, right?
12                 MR. RIEDEL:  No, because those numbers net
13     out all of these direct --
14                 THE COURT:  Oh, all of those expenses.
15                 MR. RIEDEL:  Yes.
16                 THE COURT:  I see.  Okay, that's what I
17     was missing, then.  Okay.  And then the numbers that
18     are on the budget, they also include payments that
19     are being paid to subcontractors and materialmen?
20                 MR. RIEDEL:  Yeah, I -- and, Your Honor,
21     the remaining cost to complete, obviously most of
22     the money we're spending here is deducted from these
23     amounts.
24                 THE COURT:  Right.
25                 MR. RIEDEL:  So you actually -- all of
```

1    these amounts here are going to be on the budget --

2    excuse me, on the Exhibit A budget -- are going to

3    be included in the remaining cost to complete.

4    THE COURT:  Right.  I understand now.

5    MR. RIEDEL:  So we're actually going to

6    net on top of that the $3 million.

7    THE COURT:  I see.  Okay, Mr. Warren?

8    MR. WARREN:  Your Honor, I spent most of

9    today trying to understand the math, and could not.

10    So I will just tell Your Honor that I think I'm

11    mathematically challenged with this case.

12    The bank had attempted, back in May and

13    early June, to understand the circumstances with

14    respect to the borrowing base that the Debtor had.

15    The bank's $4.6 million line of credit matured a few

16    weeks ago.  The bank has another $2.1 million in

17    letters of credit.

18    So the bank was very concerned about the

19    status of the accounts receivable and its cash

20    collateral prepetition, even pre the Florida

21    Trucking case.

22    Since that time, the bank has not been

23    furnished with adequate information to sort of track

24    and see what we thought was the status in May to

25    what the status is right now.  And we're sort of

1          looking at things for the first time.

2                    So it's absolutely impossible for me to

3          do anything other than say that the bank does not

4          consent to the use of its cash collateral at this

5          particular point in time.

6                    I've talked to Mr. Riedel at some length

7          this morning.  We've advised the Debtors that we

8          need desperately to understand the math and the

9          circumstances with respect to what they're doing.

10                   You know, this is a longstanding entity in

11         this community.  The principals of this entity are

12         people that are well-known and well-recognized.  And

13         so it's hard for me to say, today, that there's no

14         opportunity to make something happen good here with

15         respect to this case.  But on the other hand, we're

16         not comfortable with any of the analysis that's been

17         provided.

18                   We have done some study with respect to

19         the bonded claims.  I don't know whether the

20         collection that Mr. Riedel referred to postpetition

21         of $700,000 dealt with a bonded claim which gets

22         caught into the cycle of subrogation rights that

23         Travelers may have, or whether that's money coming

24         from other contracts that are not bonded.

25                   So we're just not in a position, Your

1      Honor, today to say that we agree to what's being

2      done.  But I do believe if the Court will order

3      and direct the Debtor to provide some of this

4      information that the bank's been asking for,

5      certainly before we come back in two weeks, we

6      could be in a position to comment.

7           We will also acknowledge on the record

8      that the bank is sensitive to the fact that many of

9      these contracts are important, need to be dealt

10     with, so consequently we think that it's appropriate

11     for the Court to exercise its discretion based upon

12     the proffers that have been made.  We don't have any

13     dispute with proffers of Mr. Riedel; we just don't

14     understand the numbers.

15          THE COURT:  All right.  So the bank

16     doesn't --

17          MR. WARREN  Consent.

18          THE COURT:  -- consent to the use of cash

19     collateral.  On the other hand, the bank doesn't

20     want the Debtor shut down.  The bank understands

21     that the Debtor needs to complete these projects.

22          MR. WARREN:  It may be necessary or

23     appropriate for the Debtor to be shut down, but

24     right now we don't have the information to say.

25          THE COURT:  I understand.  All right, I

1      understand.  All right, Ms. Adams?  And you're

2      representing Travelers.

3             MS. ADAMS:  Yes, I am, Your Honor.  Thank

4      you.  I'm glad everybody recognizes Pearlman and the

5      sureties' rights.  That cuts out a good half hour of

6      today.  As the Supreme Court recognized and is

7      recognized in Florida and in other Bankruptcy Court

8      cases, we have equitable subrogation rights to those

9      contract funds that are superior to everyone to

10     completed the bonded projects and to pay

11     subcontractors and suppliers.

12            I also have not had much time with this

13     spreadsheet but I am pretty good at math.  And if

14     Your Honor will look at the amounts that the Debtor

15     admits is owed to subcontractors and suppliers.

16     That's the outstanding accounts payable column.

17            If you go down to the bottom of that, it

18     is some $10.6 million.  And these are the Debtors'

19     numbers.  We haven't vetted them.  But they admit

20     that they owe that money to subs and suppliers right

21     now.

22            If you look at their budget, the amount

23     that they're going to pay, this is their Exhibit A

24     -- and this is hard for me to read.  But if you look

25     at what they're saying they're going to pay subs and

1 suppliers, the direct subcontractor for the next 30

2 days, they have $1.5 million.  The direct material,

3 which I'm assuming is suppliers, is $1.3 million.

4   So what it looks like they're proposing

5 here -- and I can't speak for them, but what it

6 looks like they're proposing here is to pay only a

7 small fraction of what they admit is owed, or

8 they're proposing to not pay what they admit is owed

9 at all and only to pay what they think they're going

10 to incur over the next 30 days.  And I submit that

11 number two is probably more likely than number one.

12   The problem with that is, these guys

13 probably are not going to go out there and work for

14 a bankruptcy Debtor before they get paid these

15 amounts.

16   There are contract balances out there.

17 And what Travelers would like and what Travelers

18 would request the Court do vis-à-vis the bonded

19 contracts, is order that the Debtor deposit any

20 money that they have collected on the bonded

21 contracts into a separate account.  Open up a trust

22 account where those monies can be separately

23 segregated from the unbonded work and used only to

24 pay directed bonded contract expenses, to pay the

25 subcontractors and suppliers on the bonded projects

1    and to pay direct project labor which is very small.

2            By the Debtors' own admission, if you

3    look, he said the direct labor that they fund for

4    the project is about 4 percent, which means, as most

5    contractors in the business that Kearney is in, that

6    means they subcontract almost all of their work.

7    Based on these numbers they self-perform almost no

8    work, so there should only be limited expenditures

9    for direct labor related to, as they say, our three

10   bonded projects.

11           One fear I have, Your Honor, if you look

12   at this chart, is that you have nine non-bonded

13   projects that they say are ongoing and three bonded

14   projects.  They have no right -- in fact it's

15   against Florida law -- to use the funds off our

16   three bonded projects to fund those nine unbonded

17   projects, which again is why it's critical that the

18   bonded money be separately accounted for and put

19   into a separate account.

20           I do not believe it would be unduly

21   burdensome for the Debtor to open a separate account

22   and then provided Travelers with accountings.  And

23   we would like those accountings to be provided

24   before they actually write the checks so we have an

25   opportunity to come in to Your Honor if we object to

1          something they want to pay with our bonded contract

2          funds, and say, "Your Honor, we object," and have

3          Your Honor determine on an emergency basis whether

4          that's a legitimate project cost.  Thank you, Your

5          Honor.

6                    THE COURT:  All right, thank you.  Mr.

7          Riedel?

8                    MS. BURNETTE:  Judge, could I have a word?

9                    THE COURT:  Oh, yes, I'm sorry.

10                    MS. BURNETTE:  Judge, it's not really an

11          objection; it's just some concerns that maybe

12          counsel can address.  As far as the numbers, I will

13          tell you, Your Honor, that the accounts receivable

14          that are stated in the motion versus the accounts

15          receivable that are stated in the motion versus the

16          accounts receivable that are stated in the cash

17          management report versus the ones received today,

18          all three are different.  So, you know, there is

19          some question about the accounting and what's the

20          accurate amount.

21                    The other thing, Judge, is I understand

22          that we do have materialmen and we have

23          subcontractors.  And my concern is -- and nobody's

24          actually said this, but that you are authorizing or

25          attempting to authorize payment of these claims that

1   may be prepetition.  And I don't know if the correct

2   vehicle for that is the cash collateral versus some

3   other type of motion that counsel should file to

4   address prepetition amounts that have to be paid in

5   order to be able to collect the money on the jobs.

6           And the one other issue, Judge, and I'm

7   not sure if this is included in the budget but --

8   and I don't know if you remember this from the

9   Florida Trucking case, but this Debtor, or one of

10  these Debtors was the DIP financer of Florida

11  Trucking.

12          And I don't know if those amounts have

13  been or whatever is needed to continue operating

14  those cases is included in the budget that's been

15  provided.  Those are things that I think need to be

16  addressed.

17          THE COURT:  All right, thank you.  Does

18  anyone else wish to be heard before I ask Mr. Riedel

19  to respond?

20          MR. BROOKS:  Yes, Your Honor, if I may.

21  Rabian Brooks again on behalf of GE Capital.  Judge,

22  I just entered our notice of appearance, I believe,

23  yesterday and haven't had a chance to, I think just

24  as Bank of America indicated, really digest the

25  information and form an opinion as to whether we

1    consent or object.

2         If I could take just a few minutes and

3    kind of let the Court get a understanding of the

4    background relative to the loan with GE.  The

5    Debtor, Your Honor, Kearney Construction Company,

6    LLC, is obligated on a note with GE.  The current

7    outstanding principal balance is just under

8    $17 million on that note.

9         The other Debtor that we're discussing

10   today, Kearney Construction Company, Inc. is a

11   guarantor under the note.

12        Judge, this note is secured by a mortgage

13   that has been given on the property that's been

14   defined as the business offices in the Debtors'

15   joint case management summary on Joanne Kearney

16   Boulevard.  That property we understand is owned by

17   an affiliated entity by the name of MPAMS, LLC, who

18   gave GE a mortgage on the property.

19        Kearney Construction Company, LLC has

20   provided GE with a UCC Form 1 which appears to be

21   blanket in nature but somewhat limited to the

22   equipment, furniture, fixtures that are used to

23   operate the property, as well as any contract rights

24   and deposits and rents relative therefrom.

25        We're still in the process of gathering

1    our loan information to analyze our security

2    interest.  I did not have the benefit of the chart

3    that's been discussed today and haven't had a chance

4    to digest any of that information.

5            I would like to let the Court know that

6    the note has been in default with GE since April of

7    '09.  The monthly debt service on that obligation,

8    Judge, is $136,984.94, which is contrary to what

9    Your Honor will see as reflected on Exhibit A, the

10   budget.

11           MR. RIEDEL:  They list GE commercial note

12   payment of, looks like 2,000 and 1,000.  Again, I

13   haven't had a chance to digest all the info but it

14   certainly isn't the $136,000 payment that's actually

15   owed on the debt which encumbers the property.

16           So basically, Your Honor, we just don't

17   feel like we have sufficient information.  I have

18   not seen completed schedules filed by the Debtor.

19           With all the related entities that are

20   involved, we think it's vital that GE and the other

21   creditors be aware of which of the entities own what

22   assets and which of the creditors' security interest

23   liens apply to those and in what order, in order for

24   us to make a determination.

25           The only other thing the Court -- that I'd

1    like -- that my client requested that we ask the

2    Court is if Debtor's counsel or another lawyer sends

3    a proposed order, we have an opportunity to review

4    it before it be considered by the Court.

5         THE COURT:  All right, thank you.  Does

6    anyone else wish to be heard?

7         (No response.)

8         THE COURT:  All right.  Mr. Riedel, then,

9    it seems to me that the things that the Court's

10   looking for you to respond to are:

11        Whether the Debtor's able to comply with

12   Travelers' request that proceeds from bonded jobs be

13   segregated and used only to pay for the expenses of

14   those bonded jobs.

15        Whether, as Ms. Burnette mentioned,

16   there's a concern that the Debtor is really seeking

17   to pay prepetition claims for materialmen and

18   subcontractors, and whether that's something that

19   ought to be sought by separate motion, or how we

20   should address that issue.

21        And certainly there's a relationship

22   between these Debtors and Florida Trucking.  I

23   didn't specifically recall that one of these Debtors

24   was the DIP lender to Florida Trucking, but it

25   didn't seem to me in looking at the budget that --

1        I'm not sure how Florida Trucking makes out.

2              If Florida Trucking is the entity that

3        operates all the equipment, what's going to happen

4        -- you know, what's the impact of the Debtor's

5        proposed budget as far as the use of vehicles and

6        equipment that are actually owned by Florida

7        Trucking and, you know, are these Debtors now using

8        these assets in a way that's going to harmfully

9        impact upon Florida Trucking?

10             And then, of course, Mr. Brooks just

11       mentioned the $136 million that's owed -- excuse me,

12       the $17 million that's owed to GE Capital.  I'm not

13       sure how that plays into this, but it certainly

14       looks as though the Debtor's balance sheets are

15       something to be concerned about.

16             And the main thing that I'm wondering,

17       because I've had a little familiarity with some

18       construction cases in the past.  And it seems to me

19       that construction cases always depend on work in the

20       pipeline.

21             And it's one thing if everyone decides

22       that the construction company's going to continue in

23       operation to complete jobs and, you know, where

24       company's going to end up at the end of the day.

25       But obviously, you know, you're always looking at

1 new business coming in the door, because that's

2 usually the source of the accounts receivable that's

3 going to be used to pay down debt.

4    So if you could address those issues,

5 please?

6    MR. RIEDEL:  Thank you, Your Honor.  I

7 might maybe talk about the last point first, which

8 is I think Your Honor is right, construction

9 companies don't thrive through extended existence in

10 Chapter 11 because they're out there trying to get

11 new jobs.

12    So I think -- I'm not sure what the exit

13 strategy is, whether it's a relative quick plan

14 where somebody infuses money and just proposes a pot

15 and people take it, or whether it's a sale.

16    There is enormous historical benefit to

17 this company, 53 years of operation, satisfied

18 customers and the like.  Whether in today's economy

19 that translates into, you know, premium over a

20 meltdown, fire sale value, we hope it does, we think

21 it does.

22    But we would agree that this case is one

23 we're going to be looking at trying to figure out an

24 exit strategy, pair off things that are not cost

25 productive, equipment that's not useful, keep the

equipment that is -- we do have some free and clear

and assets -- and try to figure out where we end up

at the end of the day.  But I think it is something

we need to move forward quickly on.

On the prepetition -- because this sort of

ties in to the Travelers as well, what we've done in

other cases here and in the Southern District in the

past on this -- because it's really complex issues.

We have a contract, and under 365 it's an

executory contract, we're entitled to perform it,

absent pre-assumption or rejection, and we believe

the other party is required to honor it.

All of these contracts require for us to

get money that we give lien releases and pay

subcontractors.  So in a sense, as Your Honor knows,

assumption of an executory contract would transform

the prepetition claim into a claim that's payable in

full.

And the only way in construction cases,

other than assuming all these contracts day one,

which then if you make a mistake saddles the estate

with enormous administrative expenses before even a

committee is formed, is the only way for us to

collect money is to honor the terms of the contract.

And it gets sorted out later.  But in the meantime

1     is for us to get lien releases, we need to do that.

2          So we don't think it's really -- we think

3     it's authorized to honor the contracts in order to

4     collect the money.  Almost in every case, our

5     contracts say that if we don't pay a sub or

6     materialman, the owner can do it directly.

7          So the other way to look at it is say it's

8     really not property of the estate, is it's property

9     of the owner that's going to pay and the owner can

10    do whatever it wants with the money, we're not doing

11    it.  We have an interest in the net, the excess, the

12    equity.

13         And for this reason, you know, Travelers

14    would -- and there's also a trust fund theory in

15    Florida and we are going to use the money.  We think

16    separate accounts -- and we're willing to let

17    Travelers -- and I told Ms. Adams that, you know,

18    we'd also try to give them copies of draw requests,

19    you know, just as a cooperative level, but we're not

20    going to wait for their approval.  We need to be

21    able to, you know, collect money from owners, get

22    lien releases, and pay subcontractors.

23         And there is no contract -- we resist

24    totally the idea that our use of any bonded funds

25    ought to be limited to our direct costs and

1    subcontractors and materialmen. There is no

2    contractor in the State of Florida that bids a

3    contract so that they can't cover their overhead

4    expenses. You know, if you look for a line it's

5    at --

6         THE COURT: And I didn't hear Ms. Adams to

7    say that. I thought that she was talking about

8    overhead that's attributable to these jobs so

9    there's obviously some sort of proration of general

10   administrative expense, it seems to me to be

11   appropriate. Do you disagree, Ms. Adams?

12        MS. ADAMS: After the subcontractors and

13   suppliers are paid, because that's the way it works.

14   That's the way it works under the trust fund

15   statute. In Florida, subs and suppliers may be paid

16   first. And then if there's any funds left over, the

17   direct project costs. And then and only then the

18   pro rata of overhead. But if you look we're three

19   out of twelve.

20        If they're right that all of these are

21   complete. And we haven't received anything, notices

22   of acceptance or anything from the owners on all of

23   these, that they are complete. And hopefully the

24   Debtor can provide that.

25        But the order I think that has to happen

1    is subcontractors and suppliers, the direct project

2    costs, then only if there's money left over that

3    portion of home office overhead that's allocable to

4    that particular job.

5         THE COURT:  All right, thank you.

6         MR. RIEDEL:  So in our view, I think maybe

7    where we differ is -- we agree -- in fact in order

8    to get the money, we're going to have to pay the

9    subs and materialmen their draw requests for that

10   period.  But we -- the amount that we're entitled to

11   draw, based on the contract, in excess of that, we

12   get to use as cash collateral, it's actually Mr.

13   Warren's client's collateral, and we use that in

14   order to keep the business.

15        So if there's any idea that we have to

16   segregate what would be our profit -- not only

17   direct costs but our overhead or anything else, on

18   an individual draw request, from a timing standpoint

19   until the project is finished and accepted by the

20   owner, would have enormous negative cash flow.  And

21   it just doesn't happen and it hasn't happened to

22   date.

23        That's not the way this contract worked

24   pre-bankruptcy, it's not the way I've seen any

25   contracts like this work in bankruptcy.  We'll pay

the subs and materialmen on the bonded jobs.  As

there are draw requests, we'll get the lien

released, that will relieve the bonding company of

liability on account of those payments that they

would otherwise have to make.

THE COURT;  Okay.  But isn't the bonding

company's concern that if -- and I'm just making up

numbers.  Let's say a million dollars is collected

on a bonded job, and $700,000 goes to pay the

subcontractors and materialmen and suppliers.  So

your perspective, I think, Mr. Riedel, is then the

Debtor has $300,000 in net profit available to use

in its business operations.

But isn't the surety's concern that if, at

that point in time the Debtor goes out of business

and the Debtor isn't able to finish the job, that

$300,000 that came in on that particular job has

actually been diverted from that job into the

Debtor's other business operations, and that

$300,000 would otherwise have been available to

complete the job?

MR. RIEDEL:  Your Honor, if the individual

draw, the way the contract works and was negotiated

and -- the bond obviously attaches to the contract,

is the way the company looks at the contract, we're

1       entitled to draw money under the contract.  That's

2       what they signed onto.  And if they had a problem to

3       begin with, with the draw schedule or something

4       else, then that was the time to raise it.

5               But we rely on our ability, for budgeting

6       and everything else, our ability to draw under the

7       contract.  If we think there's negative money on the

8       contract, that's why I say, we would be rejecting

9       this contract and --

10              THE COURT:  Okay.  And let me -- maybe I

11      answered my own question.  Is your answer really

12      that's what the retainage is for?

13              MR. RIEDEL:  Yes, the retainage --

14              THE COURT:  So that's being held back

15      until the end of the contract?

16              MR. RIEDEL:  That's what protects the

17      owner and the surety.

18              THE COURT:  Okay.  So is it your position,

19      then, that you're willing, that the Debtor's willing

20      to segregate the collections that come in and to pay

21      the expenses that are associated with those --

22              MR. RIEDEL:  We would prefer to separately

23      account --

24              THE COURT:  Okay.

25              MR. RIEDEL:  -- rather than have twelve

separate accounts, open bank accounts, but we would

separately account, as we do now, for the jobs so

that we would make sure that the money that comes in

is used to pay the subcontractors on that job before

anything else.

So I think that's the way we would operate

on the bonded jobs and make sure that we didn't use

money that should have gone to pay subcontractors

and materialmen for other purposes until they're

paid.

THE COURT:  Okay.

MR. RIEDEL:  And that's what will happen

on the joint checks, Your Honor.  I mean, that's

another way of saying the joint checks.  We're going

to make sure the subs and materialmen, whether it's

a bonded job or somewhere else, gets paid.

THE COURT:  Okay.  And then what is the

interrelationship between these Debtors and Florida

Trucking as we go forward?

MR. RIEDEL:  Mr. Pitre advises me -- and

I'm not sure where the line item is, but all of the

Florida Trucking expenses that might fall under

this, equipment costs, but they're all built in

here.

THE COURT:  Okay.

1          MR. RIEDEL:  So now this is a unified

2     budget for all of the entities.

3          THE COURT:  Okay.

4          MR. RIEDEL:  And, Your Honor, I need to

5     say that Your Honor caught me off guard a little bit

6     on the 90 days.  When we come back, don't hold me to

7     -- this chart is not a timing chart --

8          THE COURT:  I understand.

9          MR. RIEDEL:  -- and so I may have said 90

10    days.  I'll have an answer for that when we come

11    back at the next cash collateral hearing.  But I

12    think in the big picture this is absolutely right

13    but I'm not sure the timing works out quite like

14    that.

15         THE COURT:  I understand.  I understand.

16    All right, does anyone else wish to be heard?

17         MS. ADAMS:  Can I just add one thing, Your

18    Honor?

19         THE COURT:  Certainly.

20         MS. ADAMS:  I was not suggesting that the

21    Debtor go out and open 12 separate accounts.  What I

22    was suggesting is that all of the Travelers bonded

23    contract funds be placed into one separate account,

24    which I don't think is too onerous.

25              That way we're not going through -- he has

1    a whole lot of -- in fact he has, you know, on the

2    open projects more unbonded than bonded.  So we

3    don't have to sit there and try to sort through

4    expenditures on a whole bunch of projects that don't

5    involve us.

6            What I would just like is an account where

7    just the bonded -- one account where all the bonded

8    contract money goes.

9            And if I could, I understand they don't

10    want to gives us a right of approval at this point

11    in time but if they could give us advance notice

12    where we could come in and ask for an emergency

13    hearing.  And I think ten days, ten business days

14    advance notice of a payment.  They don't make their

15    -- in the construction industry, they don't make

16    their payments that fast anyway.

17            If they could give us a listing of

18    everything they intend to pay ten business days

19    before they pay it, it gives us time to come in and

20    ask Your Honor for relief if we think they're paying

21    anything inappropriate.

22            MR. RIEDEL:  Your Honor, I think all of

23    these issues should be postponed until the next

24    hearing.  Mr. Pitre tells me, you know, we actually

25    pay out of our own money, bonded subcontracts and

1     materialmen, because the bill comes due, I mean

2     traditionally.

3            So we have not simply said, "We're not

4     going to pay anybody until we collect the money."

5     We also have to address the issue of the money the

6     bonding company's collecting which --

7            THE COURT:  And an adversary's been filed,

8     correct?

9            MR. RIEDEL:  No, I don't --

10           THE COURT:  Oh, I --

11           MS. ADAMS:  Yes, it has.

12           THE COURT:  There was an adversary on the

13     docket.  I don't know if that's it.  I didn't open

14     it up.

15           MR. RIEDEL:  Okay.

16           MS. ADAMS:  Yes, it has.

17           MR. RIEDEL:  And so that -- we would

18     regard that money -- so maybe we can tee that up

19     pretty quick -- as our cash collateral too.  These

20     are monies that they're collecting, we think, for

21     our account to finish these jobs, and we certainly

22     don't want to be paying subcontractors and

23     materialmen on jobs where they actually have

24     collected the money from the owner.

25           THE COURT:  Okay.  I understand.  How much

1    work is it from the Debtor's perspective to have two

2    Debtor-in-Possession operating accounts and to

3    segregate the bonded jobs from the non-bonded jobs

4    just so, as Ms. Adams stated, they don't have to go

5    through a number of disbursements and deposits and

6    figure out what's allocated to their jobs.  Is that

7    an extraordinary burden?  It doesn't seem to me that

8    it would be?

9         MR. RIEDEL:  Mr. Pitre groaned when I just

10   went back and asked him.  I think that's why I said

11   I think this -- Your Honor, if we could revisit this

12   when we come back in two or three weeks or something

13   like that, that would make sense.  We may be able to

14   respond and also have some dialogue as to how the

15   money flows.  It may not be that great a burden

16   but --

17        THE COURT:  Okay.  And how much money did

18   Travelers collect?

19        MS. ADAMS:  To my knowledge, and I'll

20   confirm this with my client, we've only collected

21   money on the Pasco County job and that's about

22   $1.9 million on the Pasco County job, and that's

23   U.S. 41, so that -- and I think the Debtor agrees

24   that's a different deal because there was a

25   prepetition termination of that contract.  And as

1    far as I know the monies were collected also

2    prepetition after that contract had been terminated.

3          But I will verify all of that with my

4    client before the next hearing.  My only concern is,

5    you know, Mr. Riedel says wait 15 days.  How much of

6    our contract funds are going to go out the door in

7    15 days if there's not an order saying they can only

8    be used for bonded contract costs?  And I think we

9    all agree that's the law.

10          MR. RIEDEL:  Well --

11          MR. WARREN:  I don't agree that that's the

12    law at all, Your Honor.

13          MR. RIEDEL:  Yeah.

14          THE COURT:  Okay, Mr. Warren?

15          MR. WARREN:  To the extent that the Debtor

16    receives funds from a bonded project, and it needs

17    to pay its general overhead and expense, it's

18    certainly authorized and permitted to do so.

19          So there's no precedent to segregate funds

20    for the Debtor to operate and simply accrue funds

21    for the benefit of the surety.  Obviously there are

22    mechanisms for the Debtor to report.

23          THE COURT:  I thought that we moved beyond

24    that.

25          MR. WARREN:  I just wanted to make sure

1    the Court knew that we didn't agree with that.

2           THE COURT:  That's fine.  But you don't

3    object to Ms. Adams' position that the direct costs

4    of the bonded job get paid out of the proceeds of

5    the bonded jobs and that the direct costs of other

6    jobs don't get paid out of the proceeds of the

7    bonded jobs.

8           MR. WARREN:  That's correct.

9           THE COURT  Okay.

10          MR. WARREN:  However the bank is

11    interested in understanding, to the extent that the

12    Debtor has advanced costs to pay things for the

13    benefit of the surety, that that gets factored into

14    the calculus at all, because it's my understanding

15    that historically the Debtor has essentially

16    prepaid.

17          THE COURT:  Right.

18          MR. WARREN:  So now we're in a position

19    where we don't want the surety to get a head start

20    at the expense of my client's collateral.

21          THE COURT:  I understand.  And Mr. Warren,

22    have you and your client made requests to the Debtor

23    for the information that you need to analyze the

24    situation such that you're comfortable that -- you

25    know, provided that that information is provided to

1    you, that you'll be able to be in a better position

2    to analyze the situation in another, you know, two

3    weeks?

4          MR. WARREN:  Yes, Your Honor.  We have

5    made the request.  Admittedly, Mr. Riedel is at a

6    disadvantage.  Mr. Leslie had to be out of the

7    country, so Mr. Riedel has not been privy to a lot

8    of the discussions, but I've made him aware of that

9    this morning.

10          So I'm assuming that whatever order the

11    Court enters today is if the Debtor does not provide

12    information, you know, almost immediately, then

13    we'll be back before the court asking for relief.

14          THE COURT:  All right.  Well, then it

15    seems to me that it's appropriate, given the

16    proffers that Mr. Riedel has made at today's

17    hearing, and in light of the objections and concerns

18    that have been raised by secured creditors and the

19    bonding company, to authorize the use of cash

20    collateral.  But we need to come back on a very

21    short time frame in two weeks, and the Court will

22    defer the request for segregated accounts until that

23    time.

24          However, I think everyone's clear and

25    everyone seems to be on the same page that the

proceeds of bonded jobs shall be used to pay the

direct expenses of bonded jobs and not the direct

expenses of other non-bonded jobs.

The Debtor is to cooperate with secured

creditors and the bonding company providing whatever

information they've requested so that they can

analyze their positions.

The secured creditors will all have

replacement liens to the same extent, validity and

priority as their prepetition liens, and the Debtor

is to provide -- to maintain its books and records

such that it can provide accounting to the creditors

of the costs and expenses related to the various

jobs.

Mr. Warren, is there anything else that

your client needs at this time?

MR. WARREN:  We need a lot, Your Honor --

THE COURT:  I know.

MR. WARREN:  -- but that will do.

THE COURT:  All right.  And then we'll

come back.  Do we have a date about two weeks out?

THE COURTROOM DEPUTY:  September 14th at

2:00 o'clock.

THE COURT:  September 14th at 2:00

o'clock.  Mr. Riedel, if you'd prepare that order

1     and circulate it among all counsel, including Mr.

2     Brooks, at his request.  Ms. Burnette?

3             MS. BURNETTE:  Judge, could we have -- at

4     the next hearing, if it's two weeks out, can we have

5     actual numbers to compare to the budgeted numbers

6     that were included, just so we can see how it --

7             THE COURT:  Right.  When we come back two

8     weeks from now, I think that certainly makes sense,

9     to see the actual numbers, petition through -- the

10     14th is a Monday, so you'd have to cut that off on

11     the 11th, I guess.  You certainly couldn't provide

12     it through the 14th.  Or as close to the 11th as is

13     practicable.

14             MR. RIEDEL:  Okay.  Thank you, Your Honor.

15             THE COURT:  Okay?  And then projections --

16     and then projections going forward.

17             MR. RIEDEL:  Your Honor, just for clarity,

18     if you look at the second block on the color-coded,

19     in the first one, Alexan at Lakeside.

20             THE COURT:  Right.

21             MR. RIEDEL:  This is one we think is

22     completed.  We have an account receivable of 242,

23     and then an account payable of 134.  And a very

24     simple thing, there's nothing in this order that is

25     going to affect our ability to collect the 242, pay

1    the 134.  That's our money then, the 107.  It has

2    nothing to do with the surety.  That money goes into

3    our general amount.  It can be used for any proper

4    postpetition purpose.

5            THE COURT:  Right.

6            MR. RIEDEL:  Thank you.

7            MS. ADAMS:  If the project is really

8    completed, Your Honor, we notice a of acceptance

9    from the owner.  Perhaps they have that but they

10    have not provided that to us.  But so them saying

11    it's completed doesn't mean the owner agrees.

12            THE COURT:  Well, they probably won't

13    collect the $242,000 unless the project is

14    completed, so that shouldn't be a problem.

15            And then just to address the issue that

16    Ms. Burnette had raised, it does seem to me that the

17    Debtor in his ordinary course of business pays off

18    materialmen and parties that are holding liens and

19    subcontractors in order to receive its proceeds.  So

20    I think the Debtor's authorized to continue to do

21    that in its performing under the executory

22    contracts.

23            MR. RIEDEL:  Thank you, Your Honor.

24            MR. WARREN:  Your Honor, just so it's

25    clear.  Only as to those contracts for which the

1    Debtor is discussing now, not anything else.  For

2    example, to the extent that the Debtor had

3    contracts, it may have obligations payable.

4    It's only to the extent that there's a --

5            THE COURT:  An active contract.

6            MR. WARREN:  An active contract, for which

7    there needs to be a release in order for the Debtor

8    to receive funds, because it's my understanding that

9    there are a number of these contracts where the

10   Debtor isn't in the positive, and we don't want any

11   money being paid with respect to those creditors.

12           MR. RIEDEL:  We intend to do it only in

13   contracts we have equity in.  We think we have

14   equity in all of those that are in those blocks, but

15   yes.

16           THE COURT:  Okay.  All right, then if

17   you'll work out the terms of an order.

18           MR. RIEDEL:  Thank you, Your Honor.

19           THE COURT:  Okay, thank you.  Okay, would

20   you like to move to the motion to pay prepetition

21   wages next?

22           MR. RIEDEL:  Thank you, Your Honor.  As I

23   alluded to, I think we have 155 or so employees.

24   And these are paid in arrears.  This is the common

25   thing Your Honor sees.  We've listed the employees

1    and the amounts they're owed.  And the total, I

2    think, is about ninety --

3              THE COURT:  $94,200, I think.

4              MR. RIEDEL:  Right.

5              THE COURT:  Okay.  And each of the

6    employees' claims would not exceed the priority

7    amount under Section 507?

8              MR. RIEDEL:  That's correct.  I think the

9    highest is about $1,200, Your Honor --

10             THE COURT:  Okay.

11             MR. RIEDEL:  -- so it's significantly

12   under.

13             THE COURT:  Is there any objection to the

14   Debtor's motion for authorization to pay prepetition

15   wages, salaries?  This does not include insiders?

16             MS. BURNETTE:  No objection.

17             THE COURT:  Okay.

18             MR. WARREN:  No, Your Honor.

19             THE COURT:  Then that motion's drafted.

20   If you'd submit an order, please.

21             MR. RIEDEL:  Thank you.

22             THE COURT:  And the next motion is the

23   Debtor's emergency motion prohibiting utilities from

24   altering, refusing or discontinuing services.  The

25   Debtor has proposed a two-week deposit?

1          MR. RIEDEL:  Yes, Your Honor.

2          THE COURT:  And has set up a mechanism in

3     the motion pursuant to which various utility holders

4     can seek additional deposits if they think it's

5     appropriate by following the procedure that provides

6     that they give notice to the Debtor first, correct?

7          MR. RIEDEL:  Your Honor, that's correct.

8          THE COURT:  All right.  any objection to

9     that motion?

10          (No response.)

11          THE COURT:  That seems pretty standard.

12     That's granted.  Then we have the motion for

13     authority to pay prepetition and postpetition

14     officer and insider salaries?

15          MR. RIEDEL:  Yes, Your Honor.  This is --

16     we seek authority to pay six parties.  And two of

17     them are small, Charles Kearney and Clay Kearney,

18     weekly $352 each.  Frank Hansen, Ken Montague, Jeff

19     Joaquin, and Joseph Pitre are the others that we do

20     request amounts that are significantly reduced from

21     prepetition.  And we put this in as to what they

22     were doing, but across the board probably a 30

23     percent reduction in officers' salaries.

24          And the amount for Mr. Hansen is

25     $4,175.30, Mr. Montague $4,884.82, Mr. Joaquin

1    $4,5766.95, Mr. Pitre $3,055.10.

2              And they're all full time employees that

3    are necessary to the continuation of the business

4    and the preservation of these collection efforts on

5    jobs that have been completed.

6              THE COURT:  Okay.  When I reviewed the

7    motion, I did not pick up that this was a reduction

8    from the prepetition salaries.  Is that the case?

9              MR. RIEDEL:  I think it's in our case

10   management, Your Honor, and I apologize if I didn't

11   get it into the --

12             MS. BURNETTE:  Judge, we did review the

13   case management and it is a reduction of the amounts

14   however, Judge, the business' course has, I think,

15   significantly downsized.  And while we don't oppose

16   this on an interim basis, we would like an

17   opportunity to gather more information about the

18   ongoing company's performance, the salary history of

19   the employees, and those kinds of things, before a

20   final order is entered.

21             THE COURT:  All right.  Does any other

22   party wish to be heard?

23             MS. ADAMS:  Your Honor, Travelers makes

24   the same reservation.

25             MR. WARREN:  And so does the bank.

1           THE COURT:  All right.  I'm sure that the

2      individuals involved are all working very hard and

3      I'm sure have an earning capability that exceeds the

4      amounts that are requested, but they are pretty

5      significant salaries in light of this Debtor's

6      financial condition.

7           It seems to me under the circumstances

8      that it makes sense to approve it on an interim

9      basis.  We can come back in two weeks and look at it

10     again further.  Actually -- well, let me just ask

11     you this, Mr. Warren, any objection to setting hits

12     out a month and then there's a little more time.

13     Maybe the 341 meeting will have taken place

14           MS. BURNETTE:  It's on October 2nd, Judge.

15           THE COURT:  October 2nd.  That's when the

16     341 is?

17           MS. BURNETTE: Yes.

18           THE COURT:  Okay.

19           MR. WARREN:  It may be a little hard to

20     come back in two weeks on that particular item, Your

21     Honor.

22           THE COURT:  Right.

23           MR. WARREN:  It's my understanding the

24     major principals are not included in this.

25           THE COURT:  I noticed that as well.  Okay.

1    So can we have a hearing date that's after October

2    2nd?  About 30 days out?

3                THE COURTROOM DEPUTY:  We have October 5th

4    at 1:30.

5                TH COURT:  All right.  October 5th at

6    1:30.

7                MR. RIEDEL:  Thank you, Your Honor.

8                THE COURT:  Thank you.  So that'll be

9    approved on an interim basis, if you would submit an

10   order.

11               All right, then we have the Debtor's

12   emergency motion for an order authorizing the

13   maintenance of the exiting bank account at Platinum

14   Bank.  I reviewed that motion.  The Debtor's got a

15   deposit of -- is it $250,000 that's security for the

16   payment of insurance premiums?

17               MR. RIEDEL:  That's correct.  We don't

18   have access to the funds because it is collateral,

19   so it makes sense to leave it in place, we believe.

20               THE COURT:  Okay.  And I don't know if

21   Platinum Bank is a approved US Trustee depository,

22   but $250,000 is, I think, under the new FDIC

23   insurance limits.

24               MS. BURNETTE:  Which is $250,000.

25               THE COURT:  Right.

1          MS. BURNETTE:  Judge, we didn't have,

2     really, an opportunity to discuss this but if the

3     Court grants that motion, we're not going to jump

4     and up down too much as long as -- I understand from

5     Mr. Riedel that DIP accounts have been opened and

6     that the monies are going to be transferred.

7          And I think there was also a healthcare

8     reimbursement account that has something less than

9     $250,000 in it also.

10          MR. RIEDEL:  That's correct.  Chase Bank

11     was the second one, Your Honor.  And that's the

12     health reimbursement.  And as of the petition date,

13     that was about $35,000.  We have set up Debtor-in-

14     Possession accounts otherwise.

15          THE COURT:  All right.  Was the request

16     with respect to Chase Bank included in that motion?

17     I didn't notice it?

18          MS. BURNETTE:  There's two motions.

19          THE COURT:  There's two motions?

20          MR. RIEDEL:  It's Docket 21, Your Honor

21     would be --

22          THE COURT:  Okay.  All right, then any

23     objection to those motions being granted?

24          (No response.)

25          THE COURT:  All right, those motions will

be granted then.  Okay, and then back to the cash
collateral motion for a minute.  I know that it may
take a couple of days to work out that order.  Since
we're coming back in just two weeks, if you'd go
ahead and file a notice of continued hearing so that
gets served on the 20 largest creditors.  That way
they have notice of the continued hearing, whether
we get that order entered before we come back or
not.  Sometimes unfortunately it takes that long.
Not on my end I don't think.  I'd like to think not
on my end.

MR. RIEDEL:  It's the bane of all lawyers'
existence is the exchange of orders back and forth
and the collection of comments.

THE COURT:  Well, I don't know if e-mail
facilitates or hinders that process, but probably
both.

MR. RIEDEL:  It just allows people to mark
it up more often.

THE COURT:  That's right.

MR. RIEDEL:  Your Honor, I assume that we
can put nunc pro tunc through today, though, in the
order --

THE COURT:  Yes.

MR. RIEDEL:  -- so that we're authorized

1    to go forward and spend money and -- thank you.

2              THE COURT:  Right, that's fine.  And then

3    did we have Mr. Kirk's motion on with Hardin

4    Construction?

5              MR. RIEDEL:  Yes, we're willing to --

6    we're not objecting to having that heard today, and

7    I think we've entered into a resolution of that.

8              MR. KIRK:  Your Honor, we have.  And first

9    of all I appreciate Your Honor getting this on the

10   calendar on such short notice.  There is some

11   urgency to it, for a few reasons.

12             First, we are doing the taxiway at the

13   airport.  And if that's not done timely -- and it's

14   got to be done in nine days -- then airplanes can't

15   go over it.  So it is important.

16             We're the general on it, the Debtor's the

17   sub.  They're providing earthwork, compaction and

18   soli work, pavement work and so forth.  As I said

19   the second phase has to be done in nine days.  We

20   think it's essential that that gets done.

21             Mr. Riedel sort of previewed what we're

22   going to do -- or hopefully if the owner approves

23   it, to get that project done timely.  And that is

24   deferring ruling on this motion itself but having an

25   interim order that provides some of the bells and

1  whistles that he spoke of.

2         In particular, one, we would have the

3  right to send joint checks.  I think there would be

4  a contemporaneous exchange of a joint check with the

5  release of a lien.  All contract rights would

6  continue.  What we're trying to do is just preserve

7  the status quo.

8         Most importantly is if there is a stoppage

9  in work -- and we understand that the Debtor intends

10  to finish this project -- if there's a stoppage in

11  work, that we could get emergency relief.

12         The reason for that is it's not as easy as

13  snapping our fingers and getting a replacement to

14  finish this work.  We've got to go through a bidding

15  process.  They've got to come out, look at the

16  project, see what needs to get done so --

17         THE COURT:  All this in nine days?

18         MR. KIRK:  All this in nine days, right.

19  And so Mr., I think, Riedel and I have agreed to

20  those terms in principal, and we can work on an

21  interim order.

22         MR. RIEDEL:  Yeah, and we agreed that

23  we're going to work and they agreed that they're

24  going to pay us,  And so if we don't work they can

25  ask for emergency relief and we'll be here.  And if

1    they don't pay us, we'll ask for emergency relief

2    and they'll be here.  So that's fine.

3              THE COURT:  All right, t hat's fine.  Then

4    I'll look forward to your submitting an agreed upon

5    order.

6              MR. KIRK:  Thank you, Your Honor.

7              THE COURT:  Okay.  I think that takes care

8    of everything on the calendar today.  Ms. Adams, I

9    did notice that you filed an emergency motion that

10   was similar to Hardin Construction's motion --

11             MS. ADAMS:  I did, and if it's --

12             THE COURT:  -- as well as a motion for

13   relief from stay.

14             MS. ADAMS:  If it's acceptable to the

15   Debtor and to Your Honor, since we're going to be

16   back here on the 14th, we're happy to do that on the

17   14th, if that's acceptable to everyone.

18             THE COURT:  All right, then we'll set

19   those for the 14th.

20             MS. ADAMS:  That way hopefully we can get

21   some more information because quite frankly we had

22   viewed more of these as open than they view as one.

23   So maybe we can get together.

24             THE COURT:  I see.  Okay.

25             MS. ADAMS:  Thank you, Your Honor.

1          THE COURT:  Then we'll set those for

2     hearing on the 14th and you'll get separate notices

3     of that.

4          MS. ADAMS:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          THE COURTROOM DEPUTY:  Judge, did you want

7     to move that to 3:30 instead of 2:00 o'clock then?

8     Because it may take a little longer?

9          THE COURT:  Oh, Ms. Mills is suggesting we

10    go to 3:30 instead of 2:00 o'clock, and is that so

11    that we have our own time all by ourselves?

12         THE COURTROOM DEPUTY:  Yes, Judge.

13         MR. RIEDEL:  That's on the 14th?

14         THE COURTROOM DEPUTY:  Yes.

15         THE COURT:  On the 14th at 3:30.  We'll do

16    everything then.

17         MR. RIEDEL:  Thank you, Your Honor.

18         THE COURT:  Okay?

19         MS. ADAMS:  Thank you, Your Honor.

20         MR. RIEDEL:  The only thing I'd mention is

21    housekeeping.  We did file a motion in the Florida

22    Trucking and Florida Equipment to extend the time to

23    file a plan that would otherwise be due today.  We

24    filed that yesterday.  It's not for hearing.

25         And we just think now with the

1    consolidated cases, it makes sense to --

2             THE COURT:  And I would typically handle

3    that ex parte.  Ms. Burnette, any objection?

4             MS. BURNETTE:  No, Judge.

5             THE COURT:  Okay.  And what the -- was a

6    time period requested for the extension?  Was that

7    set forth in the motion?

8             MS. HART:  It only asked to make it

9    consistent with whatever time period is set in the

10   Kearney cases.  So perhaps we can determine that at

11   the status conference and that motion can be set

12   then.

13            THE COURT:  Right.  Why don't we do this.

14   Why don't we -- because I don't know what the

15   deadline was.  Were we coming up on that deadline

16   pretty shortly?

17            MS. BURNETTE:  It was September 1st,

18   I think.

19            THE COURT:  I see, all right.  Why don't

20   I grant the motion.  And in the order granting the

21   motion, set the case for a status conference,

22   together with the status conference that gets set in

23   the Kearney cases.

24            MR. RIEDEL:  Perfect.

25            THE COURT:  Okay?

1            MR. RIEDEL:  Thank you, Your Honor.

2            THE COURT:  All right.  Thank you all.

3            MR. WARREN:  Thank you, Your Honor.

4            MS. ADAMS:  Thank you, Your Honor.

5            THE COURT:  Court will be in recess.

6            THE COURTROOM DEPUTY:  All rise.

7            (Whereupon, the proceedings concluded

8      at 3:21 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, CHERYL CULVER, Certified Court Reporter, Notary Public, and Administrative Office of U.S. Courts Approved Transcriber, hereby certify that the foregoing proceedings were transcribed from a copy of a CD of the electronically recorded hearing that was provided by the court.

I FURTHER CERTIFY that the foregoing transcript constitutes the official record of said proceedings prepared to the best degree possible based on the quality of the recording, phone appearances, speaker proximity to microphones, completeness of speaker identification logs, without benefit of exhibits, and given the expedited and/or technical nature of the proceedings.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of counsel involved in the matter, nor do I have any interest in the outcome.

THIS CERTIFICATION is limited to originals and official copies of transcripts bearing the reporter's original signature in blue ink and official seals. Transcripts are not authorized to be distributed to anyone other than the ordering party and copies are to be purchased directly from the reporter. Further, transcripts are not intended to be circulated as they may contain unredacted personal information restricted by judiciary privacy policy.

SIGNED AND SEALED this 9th day of September, 2009, in Tampa, Florida.

_Cheryl Culver_

Cheryl Culver, CCR, B-1281
Certified Court Reporter
State of Florida Notary Public